THE SEHAT LAW FIRM, PLC
Cameron Sehat, Esq. (SBN 256535)
Jeffrey Mikel, Esq. (SBN 350671)
5100 Campus Drive, Suite 200
Newport Beach, CA 92612
Telephone: (949) 825-5200
Facsimile: (949) 313-5001
Email; cameron@sehatlaw.com

Attorneys for Plaintiff Whitney Feeney, individually and on behalf of the Estate of Scott Powers

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHITNEY FEENEY, individually and on behalf of the Estate of Decedent, SCOTT POWERS,<br><br>          Plaintiff,<br><br>     vs.<br><br>COUNTY OF SANTA BARBARA, a government entity; WELLPATH, L.L.C., a Delaware Limited Liability Company; SARAH NEWELL, individually; DEBORAH WELLS, individually; DEBRA MASSETTI, individually; LAUREN ALEXANDER, individually; M. RODRIGUEZ, individually, FIELDING, individually; RAMIREZ, individually and DOES 1 through 10, inclusive ,<br><br>          Defendants. | Case No.:  24-5639<br><br>**COMPLAINT FOR DAMAGES**<br>1. **False arrest and Detention under 42 U.S.C. §1983**<br>2. **Deliberate Indifference to a Substantial Risk of Harm to Health (42 U.S.C. § 1983, 8th & 14th Am. of U.S. Constitution)**<br>3. ***Monell*-Failure to Train (42 U.S.C. §1983)**<br>4. ***Monell*- Unconstitutional Custom, Practice and Policy -42 U.S.C. §1983**<br>5. **Supervisory Liability per 42 U.S.C. § 1983**<br>6. **14th Amendment-*State Created Danger***<br>7. **14Th Amendment-Interference With Familial Relations - 42 U.S.C. § 1983**<br>8. **Negligence –Wrongful Death (State)**<br>9. **Bane Act C.C. 52.1 Et Seq. (State)**<br>10. **Failure to Summon Medical Care (California Government Code § 845.6)**<br>**DEMAND FOR JURY TRIAL** |

**PRELIMINARY STATEMENT**

1.  Plaintiff, Whitney Feeney, is the adult daughter and successor-in-interest to, Scott Powers, the decedent. Whitney Feeney is also acting in the capacity of a personal representative of the estate of SCOTT POWERS.

2.  Plaintiff, on behalf of Decedent, an inmate at the Santa Barbara County Jail, (hereinafter, "the SBC Jail") operated by the Santa Barbarba County Sheriff's Department, bring this action against the County of Santa Barbara ("COUNTY"), jail deputies  DOES 1 through 4,  jail supervisor/Sergeant and watch commander DOES 5-6,  Wellpath correctional nurses Sarah Newell, and Nurse Practitioner Debra Massetti, Wellpath medical staff DOES 7 through 9, and DOES 10 for monetary damages to redress for the decedent's injuries and death resulting from Defendants' deliberate indifference to his constitutional rights and liberties including his serious medical and psychiatric condition. Plaintiff brings this action under the Fourteenth Amendment of the United States Constitution and the Civil Rights Act of 1871, as codified at 42 U.S.C. § 1983, for injuries and death suffered as a result of the Defendants' substantial and deliberate indifference to Decedent's known suicidal and psychiatric state while in their custody. Plaintiff further brings her 14th Amendment Deliberate indifference claim under the recent 9th Circuit Court of Appeals decision in *Gordon I and Gordon II (Mary Gordon v. County of Orange et* al. *888 F.3d 1118; Gordon v. Cnty. of Orange, 6 F.4th 961, 970, 72 (9th Cir. 2021) (finding a pre-trial detainee has a right to medical screening and direct view safety checks)*. Plaintiff also state a claim against the Defendants for a failure to establish policies, procedures and training which resulted in the subject incident. This is a civil action seeking damages against the Defendants for committing acts under color of law, and depriving Decedent of rights secured by the Constitution and laws of the United States (42 U.S.C. § 1983). Defendants  COUNTY, Deputy RODRIGUEZ, WELLPATH, Deputy FIELDING, custody staff RAMIREZ, DOE Deputies 1 through 4, DOE

Supervisors and watch commanders 5-6, Correctional Nurses NEWELL, ALEXANDER, WELLS, and Nurse Practitioner, MASSETTI, and DOES 7 through 10, and Santa Barbara County Jail management and employees including DOES "seven" through "ten", were deliberately indifferent by, without limiting other acts and behaviors: failing to provide psychiatric care, failing to summon medical care and/or hospitalize Decedent in lieu of arresting him and taking him in custody, failing to follow its established medical care and treatment protocol; failing to monitor a known and actively suicidal inmate, failing to follow suicide protocol including suicide assessment; failing to protect decedent from harm; failing to provide necessary and appropriate medical treatment and, failing to provide necessary and appropriate personnel necessary for the health and welfare of Decedent, who at the time of death, was a pretrial detainee at the Santa Barbara County Jail, in Santa Barbara County, California. Defendants deprived the Decedent's rights as guaranteed by the Fourteenth Amendments to the Constitution of the United States against cruel and unusual punishment.

3.   The Defendants, and the Santa Barbara County Jail and Wellpath medical officials, management and employees violated the decedent's constitutional rights and were deliberately indifferent by, without limiting other acts and behaviors: (1) deliberately ignoring and failing to heed to decedent's serious medical condition, to wit, decedent's obvious and expressed suicidal ideation, (2) Denying decedent's request to be seen by the City-NET crisis assessment team and wrongfully arresting him instead, (3) Denying decedent's request to be admitted to the Crisis Stabilization Unit, (4) Prematurely discharging Decedent from his safety cell without reasonable cause and without reasonable assessment for suicidal ideation, (5)  Failing to provide reasonable treatment for Decedent's opiate withdrawals and active psychological distress, physical pain (6) Deliberately ignoring decedent's worsening mental health as he repeatedly told defendant numerous ways of committing suicide, and, became increasingly silent and non-communicative; (7)

Failing to monitor Decedent once he was released from the observation unit to monitor his actions as he slowly climbed onto a second floor tier railing and jumped over, head first to his death (8) Failing to use appropriate and generally accepted law enforcement procedures for handling mentally ill and/or emotionally disturbed persons or persons in medical crisis (9) Failing to continuously assess decedent as an active suicide risk (10) Failing to follow the County's own jail suicide watch policies for classification and monitoring pretrial detainees (11) Failing to provide reasonable mental health treatment (12) Failing to provide medication assisted treatment (MAT) to a known opiate withdrawing inmate and despite his stated desire and history of MAT.  As a consequence of the defendants' actions, DECEDENT suffered debilitating physical and emotional injuries as he suffered multiple blunt force trauma and complication ultimately leading to his vegetive state and ensuing death, and which action constituted a clear deprivation of her constitutional rights.

## JURISDICTION AND VENUE

4.  This action is filed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983, to redress injuries and the death suffered by the plaintiff's decedent at the hands of defendants.

5.   By government claim forms dated March 24, 2024, pursuant to Government Code §911.2, Santa Barbara County, through its Clerk of the Board of Supervisors, was sent a Notice of Claim regarding violations of Plaintiff' and Decedent's constitutional rights. The claim stated the time, place, cause, nature and extent of the plaintiff's and decedent's injuries. Plaintiff, through her counsel also issued a notice of Spoliation to COUNTY and its representatives on March 13, 2024, requesting to preserve any and all materials including jail video surveillance footage.

6.   On May 2, 2024, the County of Santa Barbara, through its Clerk of the

Board of Supervisors, rejected the government tort claims of Whitney Feeney.

7.    This Court has jurisdiction over the federal civil rights claim pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367(a).

8.    At all relevant times, the Decedent was an inmate at the Santa Barbara County Jail operated by the Santa Barbara County Sheriff's Department, a subsidiary of COUNTY.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

## PARTIES

10.    At all times relevant to this complaint, Plaintiff, Whitney Feeney, is the daughter and successor-in-interest to POWERS, and is an individual residing in the state of Ohio.

11.    At all times relevant to this complaint, POWERS was a non-convicted inmate, also known as a pretrial detainee, who was housed at the Santa Barbara County Jail, California, where he committed suicide.

12.    Defendant Santa Barbara County, hereinafter known as "COUNTY", is a governmental entity that acts through individuals to establish its policies and that is capable of being sued under federal law.

13.    The Santa Barbara County Sheriff's Department is a duly organized public entity, form unknown, existing under the laws of the State of California and is responsible for supervising and operating the Santa Barbara County, a correctional division, and ensuring the health and safety of all inmates and pretrial detainees incarcerated in its corrections facilities.

14.    At all relevant times to the Complaint, COUNTY had contracted out its jail correctional medical services to WELLPATH, LLC, a private, for-profit limited liability company.

15.    Defendant M. Rodriguez, hereinafter referred to as "RODRIGUEZ" is an employee of the Santa Barbara County Sheriff's Department and upon

information and belief, and at times relevant to the complaint were employed in the capacity of a sheriff's deputy (ID no. M 5319). Defendant RODRIGUEZ is a duly authorized employee and agents of the Santa Barbara County Sheriff's Office, and was acting within the course and scope of his perspective duty as sheriff's deputy with the complete authority and ratification of his principal, Santa Barbara County.  Defendant RODRIGUEZ is being sued in his individual capacity.

16.  Defendant Fielding, hereinafter referred to as "FIELDING" is an employee of the Santa Barbara County Sheriff's Department and upon information and belief, and at times relevant to the complaint were employed in the capacity of a jail deputy. Defendant FIELDING responded to Mr. POWERS's man down incident after he jumped and was responsible for the supervision and monitoring of inmates housed general population housing where POWERS committed suicide on December 31$^{s,}$ 2023. Defendant failed to observe POWER whose slow-motion action of climbing over the 2nd tier railing and is seen through video monitoring. Defendant FIELDING is a duly authorized employee and agents of the Santa Barbara County Sheriff's Office, and was acting within the course and scope of his perspective duty as jailer or a correctional deputy with the complete authority and ratification of his principal, Santa Barbara County. Defendant FIELDING is being sued in his individual capacity.

17.  Defendant Ramirez, first name unknown, hereinafter referred to as "RAMIREZ" is an employee of the Santa Barbara County Sheriff's Department and upon information and belief, and at times relevant to the complaint were employed in the capacity of a jailer or custody security. Defendant RAMIREZ responded to Mr. POWERS's man down incident after he had jumped and was responsible for the supervision and monitoring of inmates housed general population housing where POWERS committed suicide on December 31st. Defendant failed to observe POWER's whose slow motion action of climbing

over the 2nd tier railing and who can be seen through video monitoring, Defendant RAMIREZ is a duly authorized employee and agents of the Santa Barbara County Sheriff's Office, and was acting within the course and scope of his perspective duty as jailer or a correctional deputy with the complete authority and ratification of his principal, Santa Barbara County.  Defendant RAMIREZ is being sued in his individual capacity.

18.   Defendant DOES 1-4, are employees of the Santa Barbara County Jail, located in Santa Barbara County, and at times relevant to the complaint was employed in the capacity of a correctional deputies and staff. Defendant DOES 1-4 are a duly authorized employees and agents of the Santa Barbara County Sheriff's Office, and were acting within the course and scope of their perspective duties as jail staff in the Santa Barbara County Jail with the complete authority and ratification of their principal, Santa Barbara County.  Defendant DOES 1-4 are being sued in their individual capacity.

19. Defendant Sarah Newell, hereinafter referred to as "NEWELL", is an employee of defendant WELLPATH, was employed in the capacity of a registered nurse. Defendant NEWELL is a duly authorized employee and agent of the WELLPATH, and was acting within the course and scope of her perspective duties as correctional nurse at the Santa Barbara County Jail with the complete authority and ratification of her principal, WELLPATH.  Defendant NEWELL is being sued in her individual capacity.

20.   Defendant Deborah Wells, hereinafter referred to as "WELLS", is an employee of defendant WELLPATH, was employed in the capacity of a registered nurse. Defendant WELLS is a duly authorized employee and agent of the WELLPATH, and was acting within the course and scope of her perspective duties as correctional nurse at the Santa Barbara County Jail with the complete authority and ratification of her principal, WELLPATH.  Defendant WELLS is being sued in her individual capacity. Defendant WELLS, was responsible in part

for conducting thorough, proper and adept mental health clinical assessments, monitoring the mental health of inmates, detained and recognizing suicide risk factors, conducting state compliant suicide risk assessment, and placing detainees on suicide watch per WELLPATH policies and protocols.

21. Defendant Lauren Alexander, hereinafter referred to as "ALEXANDER", is an employee of defendant WELLPATH, was employed in the capacity of a registered nurse. Defendant ALEXANDER is a duly authorized employee and agent of the WELLPATH, and was acting within the course and scope of her perspective duties as correctional nurse at the Santa Barbara County Jail with the complete authority and ratification of her principal, WELLPATH.  Defendant ALEXANDER is being sued in her individual capacity. Defendant ALEXANDER, was responsible in part for conducting thorough, proper and adept mental health clinical assessments, monitoring the mental health of inmates, detained and recognizing suicide risk factors, conducting state compliant suicide risk assessment, and placing detainees on suicide watch per WELLPATH policies and protocols.

22. Defendant Debra Massetti, hereinafter referred to as "MASSETTI", is an employee of defendant WELLPATH, was employed in the capacity of a nurse practitioner. Defendant MASSETTI is a duly authorized employee and agent of the WELLPATH, and was acting within the course and scope of her perspective duties as healthcare providers, nurse practitioner and acting supervisor to subordinate staff at the Santa Barbara County Jail with the complete authority and ratification of her principal, WELLPATH.  Defendant MASSETTI was responsible for POWERS' welfare and to make sure he continued to receive continuous observations and treatment for both his co-morbid mental health and opiate withdrawals. Defendant MASSETTI is being sued in her individual capacity

23. Defendant, hereinafter referred to as "DOE 5" is an employee working in

the capacity of a jail supervisor and shift commander at the Santa Barbara County Jail, a subsidiary of Defendant Santa Barbara County, and at times relevant to the complaint was employed in the capacity of a jail shift commander. Defendant are a duly authorized employees and agent of Santa Barbara County Jail, and was acting within the course and scope of his perspective duties as inmate jail staff in the Santa Barbara County Jail with the complete authority and ratification of her principal, Santa Barbara County. Defendant DOE 5 is sued in his individual capacity.

24.  Defendant, hereinafter referred to as "DOE 6", is an employees in the capacity of a jail supervisor and watch commander at the Santa Barbara County Jail, a subsidiary of Defendant Santa Barbara County, and at times relevant to the complaint was employed in the capacity of supervisor and shift commander. Defendant is a duly authorized employees and agent of Santa Barbara County Jail, and was acting within the course and scope of her perspective duties as inmate jail staff in the Santa Barbara County Jail with the complete authority and ratification of her principal, Santa Barbara County. Defendant DOE 6 is sued in his individual capacity.

25.    DOES 7 through 10 are employees of WELLPATH, in Santa Barbara County, and at times relevant to the complaint were employed in the capacity of a correctional nursing and medical staff. Defendant DOES  7-10  are a duly authorized employees and agents of the WELLPATH, and were acting within the course and scope of their perspective duties as jail medical staff in the Santa Barbara County Jail with the complete authority and ratification of their principal, WELLPATH.  Defendant DOES 7-10 are being sued in their individual capacities.

26.    At all times mentioned herein, each and every defendant was the agent of each and every other defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every defendant herein.

## FACTUAL ALLEGATIONS

27.  After a 12-year period of sobriety, Mr. POWERS who was struggling with addiction relapsed on or about 2019 at around the time of his late mother's passing away.

28.  As of the date of this incident, POWERS had been struggling with mental illness and substance use disorder, had been homeless since February of 2023 and was a daily Fentanyl user for the past 2 to 6 months. POWERS relied on Fentanyl to ease the pain caused by an untreated hernia.  Due to his history of addiction, POWERS had been prescribed Suboxone[1] and had been experienced several periods of detoxification while on Suboxone. This information was well documented in POWERS' jail and outside medical facility records, all of which known to Defendants' medical and correctional staff.

29.  On or about November 2, 2023, POWERS checked in with Santa Barbara Neighborhood Clinic, a non-profit health center aimed at providing healthcare to the underserved segment of society including the homeless population. It was noted that he was homeless and that he wished to get into the "Hedges House of Hope" or another place for shelter. The provider also noted that Mr. POWERS "needs to be housed first, so he can then have a better chance at sobriety".

30. Upon a review of the Santa Barbara neighborhood clinic records which individual WELLPATH defendants had requested and obtained in the past, POWERS showed a history of substance use disorder with comorbid psychiatric diagnosis and evidence of Medication Assistance Treatment including the administration of Suboxone, prescribed to him on 8/31/23, 9/21/23 and11/02/23. The records also indicated that POWERS suffered from an Unspecified Mood (affective) disorder and an Opioid Dependence.

31.  On or about December 28, 2023, Mr. Power, who was homeless at the time of the incident, was at the Santa Barbara Showers and suffered from an acute

---

[1] Suboxone is an opiate agonist aimed at reducing cravings without reproducing the euphoric effects of the underlying drug.

onset crisis and began to actively experienced suicidal ideations. Pursuant to his sponsor from City NET, an outreach program tailored to assist homeless people, POWERS asked to be assessed by a mental health evaluator and to be voluntarily admitted at the county's Crisis Stabilization Unit.

32.   The Crisis Stabilization Unit is a short terms facility designed to provide mental health and clinical treatment including de-escalation measures to folks undergoing a crisis including suicidal ideations.

33.   On that day, at approximately 10:45 a.m., as POWERS became suicidal, and pursuant to his sponsor' advise, he dialed "911" requesting the city's crisis stabilization unit and/or be hospitalized.

34.   However, upon information and belief, the 911 dispatcher assigned Mr. POWERS's distress call to Deputy RODRIGUEZ, in addition to the Crisis Stabilization Unit evaluator who were both dispatched to the Showers. Dep. RODRIGUEZ arrived at the Showers at approximately 10:45 a.m.

35.   Despite Mr. Powers undisputed state of suicidality and crisis, Dep. RODRIGUEZ cancelled the Crisis Stabilization Unit's response and turned them away.

36.   POWERS indisputably fit the Welfare and Institution Code for a 5150 criteria for being a danger-to-self, and/or gravely disabled, and despite POWERS' expressed desire to be admitted on a 5150 basis to the CSU, which was the reason he called to begin with, Deputy RODRIGUEZ detains and unlawfully arrests Mr. POWERS for alleged outstanding misdemeanor charges and books him at the Santa Barbara County Jail on December 28, 2023 at approximately 11:57 a.m. RODRIGUEZ also turns away the crisis stabilization's unit who had responded to assessment POWERS for suicidal ideations, and were planning on transferring him to CSU.

37. At the time of his suicidal crisis, Mr. POWERS had been homeless since February of 2023 and had been self-medicating with Fentanyl to treat the pain

caused by a right-sided inguinal hernia.

38.     POWERS, while in the Santa Barbara County Jail, had merely been charged with a crime and had not been convicted of anything.

39.     Accordingly, POWERS was a pre-trial detainee, and was thus guaranteed rights pursuant to the due process clause of the Fourteenth Amendment, to objectively reasonable medical care, under Gordon v. County of Orange, 888 F. 3d 1118, 1124-25 (9th Cir. April 2018) &  6 F. 4th 961 (9th Cir. July 2021) *(Gordon I and II).*  A pretrial detainee has a further right to receive medical care from Defendants which includes the right to psychiatric treatment. (*Gibson v. County of Washoe,* 290 F.3d 1175, 1187 (9th Circ. 2002). "Just as a prisoner may starve if not fed, he or she suffer or die if not provided adequate medical care. A prison that deprives prisoner of basic sustenance including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society. "*Brown v. Plata*, 563 U.S. 493, 131 S. Ct 1910, 1928 (2011).

40.     At all relevant times to the complaint, POWERS was *acutely* suicidal. Acute suicidality is defined as engaging in either self-injuring behavior or actively threatening suicide with a specific plan. According to NCCHC (National Commission on Correctional HealthCare), a nationwide governing body which sets standards in correctional healthcare and which counties rely upon in creating jail mental health and medical standards and policies, an acutely suicidal inmate should be placed on *constant observation* and not left unmonitored[2].   Jail areas where suicidal inmates are monitored should be as suicide-resistant as possible.

41.   According to the NCCHC, suicide is the leading cause of death in correctional facilities nationwide. Further many inmates with mental illness have

_____

[2] Per NCCHC standards, even a *non-acutely* suicidal inmate (potential or inactive) who expresses current suicidal ideations (eg: a wish to die without a specific threat or plan) and/or has recent prior history of self-destructive behavior *should be placed on suicide precautions and observed at staggered intervals not to exceed every 15 minutes*.

co-occurring substance use disorders.

42.   Upon information and belief, RODRIGUEZ wrote in the booking intake screening form information pertaining to POWERS' suicidal ideation: that he was suicidal, that POWERS had initially requested the Crisis Stabilization Unit to asses him, that RODRIGUEZ denied CSU's assessment of POWERS, instead arrests and books him.  All defendants were aware of POWERS pre-jail booking and noted his suicidal ideations, his substance use disorder, including his history of fentanyl addiction, and prior attempts at rehabilitation and prior intake of Suboxone.

43.   On December 28th at approximately 11:42 a.m., Nurse James conducts a Receiving Screening assessment upon POWERS  and notes his prior November 2023 incarceration, his stated Fentanyl addiction, that his has an untreated Hernia for which he takes the drug to make the pain go away, that he had last used the substance on the same day of his arrest, and was a daily user for the past "2-6" months, and that he showed a history of prior MAT (medical assisted treatment) specific to Suboxone and Buprenorphine. POWERS also expressed to Nurse Kaitlin James that he would like to go to a sober center with housing.  Nurse James places him on a COWS protocol at 11:43 a.m. upon an order by Nurse Practitioner Lawrence.

44.   Of importance to Defendants notice and assessments of POWERS, POWERS advises Nurse James of his active suicidal state of mind and ideation, that he has nothing to look forward to, feels hopeless, and specifically stating that "***he feels like jumping in front of a train***", wished he was dead, and clearly expressed thoughts of killing himself.

45.   At approximate 12:15 p.m., MHP Nurse Wendy Nishkawa performs an initial suicide watch assessment for mental health and actively places POWERS in a safety cell due to his desponded presentation, active suicidal thoughts, a noted plan for suicide, his current suicide ideations, and that he was currently on a

COWS (Clinical Opiate Withdrawal Symptoms) protocol. Although not stated in her notes, POWERS' risk for withdrawals were another reason for a suicide watch placement. She also notes he is currently on "Detox" but fails to note a prior suicidal ideation and suicide watch placement back on August 2022. Of further importance to her assessment, she notes him as a "61 year male, dirty, disheveled, depressed mood, active SI, feeling hopeless and telling her he wants *to kill himself by stepping in front of a train*, specifically noting in quotation marks: **"he will find some way to do it while in custody".**

46.  On Dec. 29th at 7:45 a.m., Defendant DOE "5", who was the day Shift Commander calls nurse WELLS via radio and instructs her to release POWERS from suicide watch forthwith, stating: "***He Is Ready to go***".  Defendant DOE 5, likely not trained in conducting any suicide assessment, mental health assessment nor administrating the Columbia Suicide Severity Rating Scale (CSSRS), commands Nurse WELLS to release POWERS seemingly with no medical justification nor reason remotely related to his suicidal state. Despite POWERS' active suicidal ideations and earlier notation that he would find any way possible to commit suicide while in custody, Defendant DOE "5", orders POWERS to be released altogether from suicide watch and to be sent to general population.

47.   Despite DOE 5's instructions, at approximately, 8:00 a.m., Nurse WELLS conducts a cursory suicide assessment on POWERS and notes he was seen "non-confidentially due to the lack of MET", he appeared to be asleep, but readily came", and that "**PT's thought process could not be further assessed as** ***PT chose not to engage further with MHP and refused to answer any of the*** ***CSSRS questions***".  Despite noting his earlier ideation of wanting to jump in front of a train and that he will find any way possible to self-harm while inside jail, WELLS fails to assess his suicidality and fails to override DOE 5's decision to release him from the suicide cell by requesting a higher supervisor medical or custody staff to review DOE 5's order to release POWERS from monitoring and

safe-keeping.  Despite POWERS' obvious despondent state, WELLS notes his "estimated current self-harm suicide risk as "low" and "appropriate for general population" whose observation were certainly coerced by DOE 5.  WELLS takes him out of the suicide watch and without reason downgrades POWERS' watch to mental health observation, with a lower level of monitoring.

48.    On December 30th at 9:01 a.m., Defendant NEWELL assesses POWERS, non-confidentially and notes some important observations about POWERS: she finds "*him shivering as the heat seems to be turned off in the hallway of the building…PT was not given a blanket, a mattress, nor a sweatshirt all night and was out of sorts….He really wanted to go back to regular housing.*" She also notes "He was *few in words* except for expressing *his desire to go back to housing*". She notes he "*denied SI, HI and* being *…PT was cleared from MH OBS*". There is no indication that POWERS was given the Columbia Suicide Severity Rating Scale, and just like that, POWERS is released into general population without any proper suicide assessment, and despite his earlier expressed plan and intent to commit suicide while in custody by finding any way he could to do so.

49.    To a reasonable degree of probability, DOE defendants and Supervisors deliberately made sure to turn the heat off in POWERS' cell to ensure "he is no longer suicidal" and rather, coerced out of the freezing environment despite his acute suicidal state.   Defendants were on active notice that by failing to conduct a full suicide assessment and not actively monitoring a patient who expresses active suicidal ideation and who expressed a specific plan to commit suicide while in custody, that such conduct is nothing short of deliberate indifference to a serious risk of suicide.

50.    Apparently, COUNTY's standard of care was to remove suicidal inmates from suicide watch as fast as possible and by *any means* conceivable without regard to an inmate being acutely suicidal, and without any apparent medical nor

mental health treatment. The goal was to get POWERS out of suicide watch and into general population with minimal observation, at the peril of his safety and welfare.

51.  On December 30th at approximately 12:08 p.m., POWERS was discontinued from suicide watch (Level 1) safety precautions and rehoused in a cell in general population where apparently the heating system was working just fine.

52.   POWERS who had yet to be assessed for suicidal ideation, continues to have suicidal ideations and now has open access to the dayroom with access to 2nd floor railings, all of which Defendants knew or reasonably should have known that relocating an actively suicidal inmate who had previously formulated a plan to jump in front of a train and who stated he would find any conceivable means to commit suicide while in custody, that relocating him to a minimal supervision and 2nd floor tier with easy jumping access,  posed an unreasonable risk of self-harm, and was deliberative indifference to POWERS' serious risk of self-harm. All Defendants had access to POWERS charting notes and upon a review were imputed POWERS expressed statements that "*he'll find a way to commit suicide while in custody*" and that he "wanted to *jump* in front of a moving train." Defendants were further aware, that POWERS mental crisis was severe enough for the Crisis Stabilization Unit to be initially summoned, albeit wrongfully turned away by Dep. RODRIGUEZ.

53.  Telling an acutely suicidal inmate to "notify" staff or custody if they resume their ideation is similar to "contracting for safety", both useless and absurd.

54.  POWERS needed continuous observation, security, supervision and access to emergent mental health treatment, all of which were denied by Defendants, enabling and contributing to this death.

55.  Per the National Commission on Correctional Health Care Standards

(NCCHC), minimal standards strongly indicated that POWERS' monitoring should have continued by medical and custodial staff as he had an urgent need for medical treatment in the form of Suboxone and/or Buprenorphine and displayed active suicidal ideations at all times relevant to the Complaint.  POWERS required a higher level of care and treatment than Defendants could provide in jail.

56.   Despite all of this knowledge that the Defendants had at their disposal, POWERS was released in general population with no monitoring.

57.   On December 31st at "7:00 a.m.", nurse ALEXANDER is purportedly the last person to see POWERS before he jumps to his death. Nurse ALEXANDER, whose soap note was authored at about 1:40 p.m., or five-and -half hours post man-down incident purports to place POWERS in minimal opiate withdrawals scoring a "2" out of a possible "48" [3] at 7:00 a.m.. Since POWERS had not been placed on any medication assistance treatment in contravention to both medical policy and against his own wishes requesting the same, his symptoms could not have realistically been a "2" which is incredulously minimal after 66 hours of untreated withdrawals. Nurse ALEXANDER failed to accurately depict the severity of POWERS withdrawal symptoms. Despite POWERS' despondent and actively suicidal state, she notes "patient does not report thoughts of self-harm. LAUREN further supplements her note at 2:45 p.m. with "will follow up with the jail chaplain; patient asking for strong reading glasses".  If after the-incident-COWS-assessment notes purporting to assess him at 7:00 a.m. POWERS had requested a chaplain at that time, then that fact alone would have placed any reasonable nurse on alert that a known suicidal inmate is making the request before attempting to commit suicide.

58.   On December 31st, at approximately 8:12 a.m.,  POWERS who was housed alone in his cell, exits his cell and steps onto the 2nd floor tier. He then begins to climb over the 2nd tier railing, in a slow and deliberate manner, all

---

[3] According to the website www.addictionhelp.com, opiate withdrawals after daily consumption of fentanyl peaks within 24 to 72 hours after last use.

caught on the housing pod's closed circuit surveillance camera. Once over the railing, he spends several more minutes standing on the outer ledge and begins to slowly look down. A few minutes later, he takes a head first plunge and lands catastrophically on his head, without using his arms to brace for impact. He then lays on the 1st floor ground helpless for close to 5 minutes, and began bleeding profusely from this face and mouth. Since he was unmonitored, no one noticed him climb over the railing and fall as we laid there unconscious.

59.   Defendants FIELDING and RAMIREZ, who at the time of his fall were responsible for the supervision and monitoring of POWERS' general population housing unit failed to observe POWERS' slow but deliberate act of climbing over the 2nd tier guard rail, and eventual act of jumping. Defendant DOE "5", who was the shift commander of POWERS housing unit at the time of his peril, was responsible for inmates' welfare and safety under his watch, yet failed to supervise, monitor and safeguard his housing unit knowing that POWERS was actively suicidal, had made expressed statements of doing anything he can to commit suicide while in custody, and had just been downgraded from active suicide watch, albeit unjustifiably, and had been transferred to a housing unit with easy access to 2nd floor railings.

60.   After falling, POWERS laid in a pool of blood for approximately 5 minutes; other inmates tried to alert jailers including FIELDING and RAMIREZ until a man down response was made. Medical staff was also summoned, but apparently, there were only two medical staff on duty at the time of the incident, ALEXANDER and an LVN. Defendants FIELDING and RAMIREZ initiated CPR and eventually, fire department medics were summoned. POWERS was taken to the hospital where he was placed on life support but due to the severity of his injuries, succumbed several days later and was pronounced dead by a hospital doctor.

61.   Defendant MASSETTI, who was acting the capacity of nurse practitioner

and supervising nurse responsible for overseeing the care and treatment of inmate patients including any inmates on post suicide watch such as POWERS, failed to monitor and adequately supervise the minimal staff on duty at the time when POWERS was allowed to roam freely and jump to his death. MASSETTI, whom upon a review of POWERS' medical chart was imputed his prior suicidal ideations including the fact that no legitimate suicide assessment was conducted before he was released from suicide watch into general population.

62.    On December 31st, at  8:29 a.m.,  *just 17 minutes* after being alerted that POWERS' had jumped from the 2nd tier, Defendant NEWELL, the same correctional nurse who had cleared and discharged POWERS from mental health and/or suicide observation the day prior, decides to write a supplemental addendum to her initial soap notes indicating "*Pt is no longer agitated or despondent and now appears focused and wants to get out of observation. Pt was cold and we got him a sweatshirt".* Yet her 12/31 soap note still contains POWERS answering "Yes" to "*Have you wished you were dead or wished you could go to sleep and not wake up?* And "yes" to *Wish to be dead: person endorse thoughts about a wish to be dead or not live anymore, or whish to fall asleep and not wake up.* Aside from these two responses indicating that POWERS remained actively suicidal on 12/30 strongly rebutting the decision to discharge him from suicide watch, her supplemental soap purports to convey that he was not actively suicidal and places his estimated suicide risk as: "low". Clearly, NEWELLS' *post-incident* charting purporting to describe POWERS in perfectly good health, written over 20 hours after she saw him the prior day and right after his suicide attempt, is doctored and self-serving.

63.   Mr. POWERS' death is a direct and proximate result of Defendant COUNTY's decision to falsely arrest Mr. POWERS while he was in a medical and psychiatric crisis, rather than allow CSU to assess him and admit him to a CSU facility to de-escalate his crisis and provide him with psychiatric treatment.

64.  Mr. POWERS' death was also the proximate result of the individual COUNTY and WELLPATH defendants RODRIGUEZ, FIELDING, RAMIREZ, NEWELL, WELLS, ALEXANDER, MASSETTI and DOES 1-10's deliberate indifference to his serious medical needs as indicated above.

65.  Mr. POWERS' death was also the proximate result of Defendant COUNTY's failure to reasonably train and supervise jail deputies and supervisors with screening, admitting, observing, monitoring, and protecting Mr. POWERS. These substantial failures depict Defendant COUNTY's policies implicitly or directly ratifying and authorizing the deliberate indifference to serious medical needs and the failure to reasonably train, instruct monitor, supervise, investigate, and discipline deputy sheriffs employed by defendant COUNTY in the use of deliberate indifference to inmate's serious medical needs.

66.  Mr. POWERS's death was additionally the proximate result of Defendant WELLPATH's failure to reasonably staff, train, supervise, and equip their medical mental healthcare staff in the proper and reasonable assessment and screening and care of emotionally disturbed and suicidal inmates in need of emergency medical treatment and deliberate indifference to the serious medical and psychiatric needs of inmates such as POWERS.

67.  The autopsy report indicated in part the following list of traumatic injuries to Mr. Powers:

Head:

(a) A 3' x 2' pink contusion over the right parietal region of the scalp

(b) Dense peri-orbital ecchymotic contusions around each eye, left greater than right

(c) Bilateral conjunctival and scleral hemorrhage, right eye greater than left

(d) Marked global subgaleal hemorrhage associated with swelling most pronounced over the bilateral temporal, parietal, and occipital

regions.

(e) Bilateral hemorrhages of the temporalis muscles

(f) A 14" displaced linear fracture from the left orbit across the top of the skull to the right lower occipital region and ending at the foramen magnum.

(g) A 4" lienar non-displaced fracture across the top of the back of the skull

(h) A 2" linear nondisplaced fracture of the left upper parietal skull

(i) A 2" displaced fracture of the right temporal skull

(j) A 2" depressed fracture of the right lower occipital skull

(k) A bilateral subdural hemorrhage let side greater than right

(l) A Global diffuse marked subarachnoid hemorrhage.

(m)      A mid line shift of the grain, left to right

(n) An Edema of the brain

(o) Multiple bilateral necrotic contusions of the base of the brain

(p) An intra-ventricular hemorrhages of the grain

(q) Multiple displaced fractures of the base of the  skull including the orbital roof, left greater than right

Neck:

(a) A marked para spinal hemorrhage along the cervical spine

(b) Fractures of C1 and C6 vertebras

Torso:

(a) Fractures of T2, T3 and T4

Extremities:

(a) A 1" abrasion over the back of the right upper arm

(b) Multiple small superficial abrasions around the right elbow

68.    At all material times, and alternatively, the actions and omissions of each Defendants were intentional, wanton, and/or willful, conscience-shocking,

reckless, malicious, deliberately indifferent to Decedents' and Plaintiff's Rights, done with actual malice, grossly negligent, negligent, and objectively unreasonable.

69.  As a direct and proximate result of each Defendants' acts and/or omissions as set forth above, to the extent permitted and pled by the various legal claims, Plaintiff sustained the following injuries and damages, past and future, among others:

      a.  Wrongful Death of POWERS, pursuant to Cal. Code Of Civ. Proc. 377.60 et seq.

      b.  Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support, pursuant to Cal. Code of Civ. Proc 377.60 et seq

      c.  POWERS' loss of life and opportunity for life per federal civil rights laws;

      d.  POWERS' conscious pain, suffering, and disfigurement, pursuant to federal civil rights law;

      e.  All damages and penalties recoverable under 42 U.S.C. 1983 and 1988, and as otherwise allowed under California and United States statutes, codes, and common law.

## FIRST CLAIM FOR RELIEF

### False Arrest and Detention under 42 U.S.C. §1983

### (On behalf of the Estate of Scott Powers and Against Defendants RODRIGUEZ and DOE 1)

70.  Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 69 of this Complaint with the same force and effect as if fully set forth herein.

71.  By the actions and omissions leading up to POWERS' admission into jail as described above, Defendant RODRIGUEZ and DOE 1 violated 42 U.S.C. sect..

1983, depriving Decedent POWERS, through Plaintiff herein, of the following clearly established and well settled constitutional rights protected by the fourth and fourteenth amendment of the United States Constitution, to wit, Decedent's right to be free from unreasonable seizure and unlawful arrest without probable cause, as secured by the Fourth Amendment and 2. Decedents' right to be free from objectively unreasonable conduct and deliberate indifference to POWERS's serious medical needs while in custody as a detainee and/or arrestee as secured by the Fourth and Fourteenth amendments.

72.   Defendants RODRIGUEZ and DOE 1 subjected POWERS to their wrongful conduct, depriving him of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety  of POWERS would be violated by their acts and/or omissions.

73.   As a direct and proximate result of defendants' conducts, POWERS suffered injuries and damages as set forth above.

74.   The conduct of Defendant's entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. 1983 and as provided by law. Plaintiff does not seek punitive damages against COUNTY.

## SECOND CLAIM FOR RELIEF

**Deliberate Indifference to a Substantial Risk of Harm**
**to Health (42 U.S.C. § 1983-14th Amendment of the U.S. Constitution,**
**(On behalf of the Estate of Scott Powers and Against Defendants**
**RODRIGUEZ, FIELDING, RAMIREZ, NEWELL, WELLS, ALEXANDER,**
**MASSETTI, and DOES 1-10)**

75.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 74 of this Complaint with the same force and effect as if fully set forth herein.

76.   From the time DECEDENT was booked into the Santa Barbara County Jail until the time of his death, the Defendants repeatedly denied DECEDENT

proper medical care in repeated violation of his 14th Amendment constitutional rights.

77.   All Defendants were informed by DECEDENT was actively suicidal, desperately requested a mental health assessment and admission to the crisis stabilization unit, required medication assistance and an active observation, monitoring and safekeeping. DECEDENT's health problems were complicated by the fact that she suffering from severe opiate withdrawals, which all Defendants knew of but denied opiate withdrawal medication in light of past medical records indicating prior prescription and against POWERS own expressed desired to initiate the medication prior to committing suicide.

78.   All of the Defendants knew there was a substantial risk to DECEDENT'S health if her mental health, medical needs, and opiate withdrawal symptoms went untreated, but repeatedly denied her appropriate medical and psychiatric treatment.

79.   It was objectively unreasonable for the Defendants to ignore the numerous objective signs and symptoms of DECEDENT's deteriorating condition particularly between December 28th to December 31st, 2023 when he made several expressed statements of active suicidality. Any diligent registered nurse or medical doctor would have been apprised of the serious impending medical condition, and promptly actively monitor POWERS who was both withdrawing from opiates and acutely suicidal.  If was further objectively unreasonable to Defendants to house POWERS in a minimal observation housing unit as because all defendants knew that the jail was unequipped to provide the level of care, monitoring and treatment that POWERS required in light of his suicidality.

80.   Defendants and each of them made numerous intentional decisions regarding the conditions of POWERS' confinement: they denied decedent's request to be seen by the City-NET crisis assessment team and wrongfully arresting him instead; they denied decedent's request to be admitted to the Crisis

Stabilization Unit; they failed to conduct adequate suicide risk assessments in order to quickly release him into a minimally supervised housing unit; they prematurely discharged Decedent from his safety cell without reasonable cause and without reasonable assessment for suicidal ideation; they failed to provide reasonable treatment for Decedent's opiate withdrawals and active psychological distress, physical pain; they failed to actively monitor Decedent once he was released from the observation unit to monitor his actions as he slowly climbed onto a second floor tier railing and jumped over, head first to his death; they failed to continuously assess decedent as an active suicide risk; they failed to follow the County's own jail suicide watch policies for classification and monitoring pretrial detainees; they failed to refer him to a higher level of care knowing they were not qualified as a crisis stabilization unit to address Decedent's active crisis; they failed to provide reasonable mental health treatment; they failed to provide medication assisted treatment to a known opiate withdrawing inmate with a prior history of MAT and against Decedent's request.

81.   As a result of the repeated denial of proper medical and psychiatric care, DECEDENT spent his time at the Santa Barbara County Jail suffering unnecessary and in agonizing pain.

82.   The Defendants, by ignoring DECEDENT in this situation and by failing to provide proper medical attention and failing to actively monitor him, failing to administer any legitimate suicide assessment evaluations, while his opiate withdrawal symptoms were aggravating and without access to medication-assisted-treatment acted with deliberate indifference to serious medical conditions and the medical needs of DECEDENT.

83.   DECEDENT was deemed to be a pretrial detainee, and such, the Defendants by their act of deliberate indifference in failing to provide medical care to treat the DECEDENT'S serious medical condition, the conduct thereof

constitutes cruel and unusual punishment in violation of the Due Process Clause of the Fourteenth Amendment of the Constitution.

84.   All Defendants were deliberately indifferent to the serious medical needs of DECEDENT. It should be adequately clear that a reasonable medical practitioner would comprehend that by denying medical care, DECEDENT was exposed to undue suffering or threat of tangible residual injury, which, in the end, proved to be fatal. The Defendant jail officials and WELLPATH individual defendants including DOES 1 to 10, intentionally denied DECEDENT proper medical care by failing to treat, to monitor, to refer to a doctor, or to transfer DECEDENT for proper care, causing him to unduly suffer for approximately 3 days before he committed suicide.

85.   Had the Defendants and their employees, agents, and servants, not acted with deliberate indifference to the obvious and serious health needs of DECEDENT, and provided prompt medical attention, he would not have died.

86.   DECEDENT'S death was easily avoidable.

87.   Such acts and omissions of the Defendants violated DECEDENT'S constitutional rights guaranteed under 42 U.S.C. § 1983, and the Eighth and Fourteenth Amendments to the United States Constitution. The defendants knew that failing to treat Decedents worsening medical problems would lead to a fatality, but not before DECEDENT endured significant pain and agony during the period preceding his death.

88.   Accordingly, Defendants each are liable to Plaintiff for compensatory and punitive damages under 42 U.S.C. § 1983 and to reasonable attorney fees under sect. 1988.

## THIRD CLAIM FOR RELIEF

### *Monell*-Failure to Train and Ratification (42 U.S.C. §1983)
### (On behalf of the Estate of Scott Powers and Against
### Defendants COUNTY and WELLPATH)

89.   Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 88 of this Complaint with the same force and effect as if fully set forth herein.

90.   Defendant COUNTY and WELLPATH knew that DECEDENT was suffering from an emergency psychiatric condition and that the Santa Barbara County Jail was not equipped to care for acutely suicidal patients. Given the known limitations of the Santa Barbara County Jail medical facility it was obvious that jail medical staff would need special training in order to care adequately for medically unstable patients and to assess whether such patients should be transferred to the hospital.

91.   The unconstitutional acts and/or omissions of Defendants as well as other employees or deputies and staff employed by or acting on behalf of the Defendant COUNTY and WELLPATH, on information and belief, were pursuant to the following customs, policies, practices and/or procedures of COUNTY and WELLPATH, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officers/deputies of COUNTY and its Sheriff's Office and/or Defendant WELLPATH by:

      a.   Denying pretrial detainees and other inmates access to timely, appropriate competent, and necessary care for serious medical and psychiatric needs, requiring such inmates in crisis to remain untreated and unmonitored in jail instead of providing for their emergency medical needs;

      b.   Allowing and encouraging inadequate and incompetent medical and mental health care for jail inmates and arrestees ;

      c.   Contracting for obviously inadequate and incompetent medical and mental health care for inmates and arrestees, including creating financial incentives for jail and WELLPATH staff not to send inmates with emergency medical needs to a hospital ;

d. Allowing, encouraging and requiring minimal nursing staff and supervision to care for inmates that are actively suicidal and/or inadequately supervised staff to assess inmates' medical and psychiatric condition, needs and treatment, including to decide whether or not to provide inmates with necessary medical assistance treatment, active monitoring, emergency care and hospitalization;

e. Failing to institute, required, and enforce proper and adequate training, supervision, policies and procedures concerning handling mentally ill and/or emotionally disturbed person in medical crisis;

f. To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers, sheriff's personnel, and Wellpath staff at the jail whereby an officer or member of the sheriff's office, or Wellpath staff does not provide adverse information against a fellow custody staff, deputy or member of Wellpath;

g. Failing to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs and procedures described in this Complaint and in subparagraphs (a) thru (f), with deliberate indifference to the rights and safety of Decedent, of Plaintiff and the public, and in the face of an obvious need for such policies, procedures, and training programs;

92. Further, the Santa Barbara County Jail nursing and custody staff had not been trained adequately in monitoring, documenting and assessing patients' acute medical conditions within the confines of a limited-care facility such as the Santa Barbara County Jail, and that this failure to train led to a substantial but fatal delay in DECEDENT's care, resulting in his death.

93. Despite COUNTY and WELLPATH's general jail policy requiring that medically unstable inmates be seen by a doctor and transferred to a hospital for

acute care, COUNTY had failed to train the Santa Barbara County Jail doctors and nursing staff adequately so as to recognize the urgency with which medically unstable inmates must be seen and assessed in light of the Santa Barbara County Jail's limited medical facilities.

94.    Defendant COUNTY had a policy of relying on medical professionals without training them on how to implement proper procedures for documenting, monitoring, and assessing inmates for medical instability within the confines of the Santa Barbara County Jail amounting to deliberate indifference.

95.    Defendants COUNTY and WELLPATH through their employees and agents and, through their policy-making supervisors, and DOES supervisors including failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants RODRIGUEZ, FIELDING, RAMIREZ, NEWELL, WELLS, ALEXANDER, MASSETTI and DOES 1-10, with deliberate indifference to Plaintiff's and DECEDENTS" rights, which were violated as described above.

96.    As a result of the COUNTY's failure to adequately train and implement policies, DECEDENT was caused undeserved pain and agony all culminating in jumping to his death on December 31st, 2023.

97.    As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, procedures of Defendants COUNTY and WELLPATH, POWERS and Plaintiff suffered serious injuries and death, Plaintiff is entitled to damages, penalties, costs, attorney's fees against Defendants COUNTY and WELLPATH as set forth, including punitive damages against WELLPATH.

<u>**FOURTH CLAIM FOR RELIEF**</u>

***MONELL*- UNCONSTITUTIONAL CUSTOM, POLICY**
**OR PRACTICE (42 U.S.C. §1983) (On behalf of the Estate of Scott Powers**
**and Against Defendant COUNTY and WELLPATH)**

98.     Plaintiff hereby repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 97 of this Complaint with the same force and effect as if fully set forth herein.

99.     On and for some time prior to December 31, 2023, (and continuing to the present date) Defendants COUNTY and WELLPATH deprived Plaintiff' decedent of the rights and liberties secured to them by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, in that said defendants and their supervising and managerial employees, agents, and representatives, acting with reckless and deliberate indifference to the rights and liberties of Plaintiff' decedent and of persons in their class, situation and comparable position in particular, knowingly maintained, enforced and applied an official recognized county custom, policy, and practice of: Acting deliberately indifferent to the serious medical needs of inmates and newly booked inmates when defendants failed to take any meaningful corrective measures despite being previously placed on notice of their egregious practices resulting in prior deaths. The following is a list of *Monell* violations:

(a)  Failing to implement policies and procedures on basic symptom recognitions and assessment of inmates who are in medical distress and suffering and posing a high risk of known suicidality with co-morbid opiate withdrawal syndrome;

(b)  Routinely failing to train detention staff on the symptoms and assessment of inmates suffering from opiate withdrawals and requiring medication assisted treatment as defendants are fully aware that allowing inmates to detoxify without appropriate opiate agonist medication and medical supervision is akin to unnecessary suffering.

(c)  Inadequately supervising, training, controlling, assigning, and disciplining employees including COUNTY and WELLPATH Jail staff;

(d)  Routinely neglecting and ignoring gravely ill inmates and enabling the custom and practice of medically distressed inmates to rely upon themselves to seek emergency medical treatment;

(e)  Engaging in the custom and practice of discriminating against chronically ill inmates and withholding emergency medical treatment until an inmate is at a near-death condition;

(f)  Routinely preventing inmates access to medical doctors, due to a custom and practice of a failed booking policy;

(g) Routinely denying to treat more severe co-morbid medical conditions due to a "*one condition at a time*" medical policy.

(h)  Routinely discharging acutely suicidal inmates using coercive means such as turning off the heat in the middle of winter;

## WELLPATH's History of Deliberate Indifference
## to the Serious Medical Conditions of Inmates

100.     Upon information and belief, Wellpath employs more than fifteen thousand people in approximately forty states while accruing nearly $1,500,000,000 in revenue annually. Wellpath was formed in November of 2018 as a result of a merger between Correct Care Solutions, LLC ("CCS") and Correctional Medical Group Companies.

101.     Kenneth McGill resided in the Jefferson County Jail in the State of Colorado in September of 2012. Mr. McGill notified the jail staff that he felt dizzy, had difficulty ambulating, and suffered a persistent headache. Unfortunately, the medical staff at the Jefferson County Jail did not transport Mr. McGill to the hospital until sixteen hours had passed since he reported his symptoms to staff members. A panel of jurors in federal court awarded Mr. McGill more than $11,000,000 in December of 2014. The jury determined that a member of the medical staff exhibited deliberate indifference to the medical needs of Mr. McGill. Also, the jury determined that Wellpath/CCS enforced an

unconstitutional policy or custom. Wellpath/CCS acquired the medical contractor in 2014 and was the sole provider of medical treatment at the Jefferson County Jail.

102.	Rashod McNulty resided at the Westchester County Jail in New York during January of 2013. Wellpath/CCS medical employees were the sole providers of medical care at the Westchester County Jail. Mr. McNulty initially reported to the jail medical staff that he experienced anxiety and pain in his chest. The medical staff on duty were also aware that Mr. McNulty fell to the ground while walking through a hallway in the jail. Mr. McNulty died of a heart attack in the Westchester County Jail. Mr. McNulty's fiancé asserted a wrongful death claim in federal court in December of 2014. Soon thereafter, in 2015, the New York State Commission on Correction published a report regarding the death of Mr. McNulty. The report emphasized that the medical staff at the Westchester County Jail did not adequately manage Mr. McNulty's chest pain complaints. Also, the Commission found that a physician prematurely diagnosed Mr. McNulty with abdominal distress while failing to perform diagnostic tests or physically examine Mr. McNulty. Lastly, the Commission stated that nurses on duty did not take immediate action to provide Mr. McNulty with medical care after he fell down in a hallway. The nurses left Mr. McNulty in his cell, although Mr. McNulty's may have survived if he had received emergency medical treatment and been transported promptly to a hospital.

103.	Dino Vann Nixon entered benzodiazepine withdrawal in the Forsyth County Jail in Forsyth, Georgia during July of 2013. Mr. Nixon did not receive prescribed medication for three weeks, and he was never assessed by a physician. Mr. Nixon died in the Forsyth County Jail due to complications of benzodiazepine withdrawal. Wellpath/CCS was the sole provider of medical treatment at the Forsyth County Jail in July of 2013. Mr. Nixon's surviving family members filed a civil lawsuit after Mr. Nixon died.

104.      David Stojcevski entered drug withdrawal in the Macomb County
Jail in Michigan in June of 2014. Unfortunately, Mr. Stojcevski died in the
Macomb County Jail due to complications of drug withdrawal. Mr. Stojcevski's
surviving family members filed a civil lawsuit and discovered that Mr. Stojcevski
had lost over forty pounds during a two-week period. The sole provider of medical
treatment at the Macomb County Jail was Wellpath/CCS.

105.      A jury found that Wellpath/CCS violated its contract with Pierce
County, Washington and ordered Wellpath/CCS to provide $1,560,000 in
financial compensation to Pierce County, Washington. The Pierce County
Prosecuting Attorney presented a letter to Wellpath/CCS responding to a demand
for payment issued by Wellpath/CCS. The prosecuting attorney noted that
Wellpath/CCS did not keep adequate medical records for patients or provide
medications to inmates. Also, the letter stated that Wellpath/CCS employees did
not address or review inmate requests for medical treatment in a timely manner.
The prosecuting attorney further emphasized that Wellpath/CCS employees did
not provide basic medical services to inmates nor did they verify inmate
medications during the booking process. The letter drafted by the prosecuting
attorney also noted generally that Wellpath/CCS provided a poor quality of
medical care to inmates and that inadequate record keeping was pervasive at all
levels of the facility. Finally, the prosecuting attorney delineated how
Wellpath/CCS experienced constant staff shortages and a lack of trained
employees. Pierce County did provide time for Wellpath/CCS to improve the
operation of the medical clinic. However, Wellpath/CCS did not bring the medical
clinic up to operational standards, and Pierce County documented innumerable
mistakes committed by Wellpath/CCS employees. The prosecuting attorney stated
the following: "[a] jury would likely find that [Wellpath/CCS's] operation of the
jail medical clinic was incompetent, unprofessional and morally reprehensible."

106.     Kendra Nelson entered heroin withdrawal in the Portsmouth County Jail in Portsmouth, Virginia in July of 2016. Ms. Nelson's surviving family members filed a civil lawsuit, and they claimed the jail staff and medical staff believed Ms. Nelson was malingering. After less than twenty-four hours in custody, Ms. Nelson died due to complications of heroin withdrawal. The sole provider of medical treatment at Portsmouth County Jail was Wellpath/CCS.

107.     Fulton County, Georgia informed Wellpath/CCS in October of 2017 that it was terminating its contract with Wellpath/CCS. Fulton County noted in its termination letter numerous problems with the medical services provided by Wellpath/CCS. The termination letter stated as follows: "the Fulton County Sheriff's Office has reported five deaths at the Fulton County Jail in the last seventy-five days."

108.     Donnie Ray Brown was incarcerated at the Coos County Jail in Oregon in October and November of 2013. Within several hours after being released from the jail, Mr. Brown died of a perforated duodenal ulcer in a hospital. The events gave rise to the case *Linda Mae Paris v. Conmed Healthcare Management, Inc., et al.*, Case No. 6:14-CV-01620-TC. Mr. Brown experienced weakness, leg swelling, stomach pain, vomiting, and shortness of breath. When Mr. Brown began regurgitating blood he was transported to a local hospital. However, the medical staff at the hospital could not prevent Mr. Brown's death.

109.     Magistrate Judge Thomas Coffin issued his Findings & Recommendations in November of 2017. Judge Coffin noted an obvious basic requirement of jail medical staff: "a corrections facility has a constitutional obligation provide adequate health care to inmates with serious medical needs." Judge Coffin also stated that the evidence would allow a reasonable jury to conclude that Wellpath/CCS enforced a policy of "failing to adequately staff the Coos County Jail with qualified medical professionals to provide promised health care to inmates." Judge Coffin noted that Wellpath/CCS did not "fulfill the critical

role of Medical Director for the Jail as promised in its proposal to Coos County." Also, Judge Coffin's Findings & Recommendations faulted Wellpath/CCS for "ratifying and endorsing the understaffing and constitutionally inadequate medical care provided to Donnie Brown by conducting and adopting findings from a mandated M&M Review process that was tainted by material misrepresentations and omissions and which resulted in the conclusion that all [Wellpath/CCS] and Coos County Jail policies were followed and adequate for the situation."

110.    Wellpath/CCS provided medical treatment to inmates at the ICE Processing Center in Adelanto, California. The Office of the Inspector General of the Department of Homeland Security transmitted a Management Alert to the facility in September of 2018. The Alert delineated a series of deficiencies with the medical treatment provided by Wellpath/CCS at the ICE Processing Center. The Management Alert noted that ICE reviews regarding the deaths of three detainees at the Adelanto Processing Center contained information regarding insufficient medical care. Overall, the Management Alert concluded that "detainees do not have timely access to proper medical care." After conducting a surprise visit to the facility in May of 2018, the Office of the Inspector General of the Department of Homeland Security noted the following: "we observed two doctors walking through disciplinary segregation and stamping their name on the detainee records, which hang outside each detainee's cell, indicating that they visited with the detainee. However, we observed them doing so without having any contact with 10 of the 14 detainees in disciplinary segregation. For the four detainees a doctor did speak with, the doctor asked if the detainee was "ok" in English, not necessarily a language the detainee understood. We confirmed with guards that these four detainees were non-English speakers, and the doctor left without any acknowledgement or response from the detainee."

111.    Jah-Quavious Anderson arrived at the Fresno County Jail on June 22, 2020. He was 29 years old. Mr. Anderson suffered from epilepsy and suffered a

seizure while in custody at the Fresno County Jail. The jail officials prevented Mr. Anderson from obtaining his seizure medication and did not provide him with adequate medical treatment. Also, the jail staff did not accommodate Mr. Anderson's medical condition because they sent Mr. Anderson to general population rather than the medical ward.

112.     In *Deloney v. County of Fresno, et al.* No. 1:17-cv-01336-LJO-EPG, 2018 WL 1693383 (E.D. Cal. Apr. 6, 2018),  John Mayberry was an inmate at the Fresno County Jail when he died on August 2, 2016. His mother, Wilma Deloney, asserted 42 U.S.C. 1983 claims against the County of Fresno and other defendants. The complaint asserted that Mr. Mayberry was deprived of his constitutional right to life and medical and mental health care for his serious mental health needs. While under the supervision of Defendants in the administrative segregation unit, but not on heightened suicide watch, Mr. Mayberry hanged himself in his cell. Mr. Mayberry was suicidal on multiple occasions at the jail and had been classified on a prior occasion as a high suicide risk at Fresno County Jail. One of the primary claims alleged section 1983 claims for wrongful death for deliberate indifference by all Defendants to Mr. Mayberry's serious medical, physical, and mental health needs during his detention.

113.     Separately, in the case of *Hanna ex rel. Henderson v. County of Fresno, et al.* No. 1:14-cv-00142-LJO-SKO, 2014 WL 6685986 (E.D. Cal. Nov. 26, 2014). Dominic Hanna was also a pre-trial detainee at the Fresno County Adult Detention Facility in Fresno, California when he was denied medical care by the jail personnel. Mr. Hanna entered the Fresno County Jail on February 6, 2012, and he had previously been incarcerated in Fresno County and his custodial and medical records contained information regarding his severe and debilitating mental health problems, and suicide attempts. Plaintiff was prescribed Lamictal to treat bipolar disorder, but he never received this medication while in the Fresno

County Jail. On February 7, 2012, Mr. Hanna repeatedly pounded the back of his head against the bars of his cell which caused a hematoma the size of a tennis ball on the back of his head. Plaintiff was placed in a suicide cell but then was removed to his cell on AJ3 in the Fresno County Jail. Jail staff knew that Mr. Hanna had stuffed socks in his mouth to attempt to asphyxiate himself. On February 9, 2012, Mr. Hanna attempted to commit suicide by stuffing two socks down his throat and ramming his head into the cell wall. Due to the suicide attempt, Mr. Hanna was transported to the hospital and survived, but he suffered severe physical and mental injuries.

114.     In Grayson v. County of Fresno, et al., No. 22CECG01628, Nathaniel Grayson was an inmate at the Fresno County Jail. Wellpath employees failed to safeguard against Mr. Grayson's known history of seizures related to alcohol withdrawal. Despite documented risk factors, Wellpath failed to properly assess and monitor Mr. Grayson's condition and withheld needed medications. As a result, on June 11, 2021 at approximately 3:45 p.m., Mr. Grayson was discovered on the floor of a sobering cell after having suffered an alcohol withdrawal related syncope. Mr. Grayson had struck his head causing a severe sub dural hematoma with a significant midline shift. Two day later Mr. Grayson was still in a coma. Doctors determined that Mr. Grayson had a very poor prognosis for any recovery and removed him from life support. Mr. Grayson was thirty-five years old.

115.     Additionally, WELLPATH was investigated by a Ventura County Grand jury in connection with twenty five (25) deaths of detained persons in Ventura County detention facilities during the time period from 2016 to 2022. The grand jury found, among other things, a) deficiencies in training regarding suicide prevention, b) that "the medical and behavioral health delivery process in the Ventura County Jails has often been reactive rather than proactive," c) that the intake screening practice and reassessments during incarceration do not always provide a complete evaluation of current medical and behavioral health, and d)

that involvement of the public and independent subject matter experts in the review of deaths in jail may reduce the risk of death."

116.     By reason of the aforementioned policies and practices of Defendants and COUNTY, Plaintiff has suffered the loss of her father, Scott Powers.

117.     Defendant COUNTY and WELLPATH, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above. Despite having knowledge as stated above, these defendants condoned, tolerated and through actions and inactions thereby ratified such policies.  Said defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiff and other individuals similarly situated.

118.     By perpetrating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, Defendants COUNTY and WELLPATH, acted with an intentional, reckless, and callous disregard for the well-being of decedent and his constitutional as well as human rights.

119.     Furthermore, the policies, practices, and customs implemented and maintained and still tolerated by Defendants COUNTY and WELLPATH were affirmatively linked to and were a significantly influential force behind the decedent's death.

120.     As a direct and legal result of Defendants' acts, Plaintiff has suffered damages, including, without limitation, past pain and suffering, loss of life, loss of opportunity for life, and compensatory damages. Such damages including attorneys' fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally, Defendants are liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

121.     As a direct and proximate result of the defendants' aforementioned conduct, the Plaintiff, successors-in-interest for DECEDENT, set forth that the

defendants are liable to them for damages including but not limited to funeral and burial related expenses, and damages to provide for the Plaintiff' deprivation and injury as a result of the loss of the decedent's support, company, comfort, counsel, familial relations, aid, association, care and services.

## FIFTH CLAIM FOR RELIEF

### Supervisory Liability per 42 U.S.C. § 1983

### (On behalf of the Estate of Scott Powers and Asserted Against Defendants DOES 5, 6 and MASSETTI)

122.     Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 121 of this Complaint with the same force and effect as if fully set forth herein.

123.     At all times relevant to this Complaint, DOES 5 and 6 were acting under color of state law as Santa Barbara County Jail Sergeants, shift commander(s), shift supervisors, and as the ranking supervisor(s) to defendant deputies and custody staff.

124.      On December 29th, 2023, Defendant DOE "5" was aware that POWERS had been monitored in a suicide watch cell with 15 min. staggered checks, and was aware that he was actively suicidal and had not been given any medication assistance treatment.  Despite being on notice of an actively and acutely suicidal POWERS, DOE "5" *orders* POWERS to be released from the suicide watch without justification nor reason and to be sent to a minimally supervised general population housing.  DOE 5, who orders WELLPATH nursing staff to release POWERS, had inexplicably made his mind that POWERS "is ready to go".   POWERS who had refused to engage in any conversation much less a suicide assessment by nursing staff which should have been an alerting sign that he was still actively suicidal, is removed without conducting any Columbia suicide risk assessment. POWERS had been mentally decompensated but was actively suicidal. As a shift supervisor, DOE 5 was also responsible to maintain

properly heated cells during the middle of winter but instructed the heating system to be turned off and made sure suicidal inmates like POWERS would not be given any warm clothing nor mattress in order to coerce inmates into falsely stating they are no longer suicidal so they can be removed from the frigid suicide watch cell and into a warmer but minimally supervised general population housing.

125.     On December 31st, DOE "6", who was acting as a shift commander and supervisor in charge of deputy and custody staff at POWERS's housing unit, no. "300", was responsible for inmates' welfare and safety and to ensure recently discharged suicide watch inmates were being observed and monitored. DOE 6 failed to order a careful watch and monitoring of POWERS' and his cell and failed to ensure that POWERS who had expressly stated that he would find any way possible to commit suicide was celled in lower trier removing the threat of a 2nd story height would pose.

126.     On December 31st, Defendant MASSETTI was the acting nursing supervisor to WELLPATH medical staff including the only two nurses on duty, nurse ALEXANDER and a licensed vocation nurse, "Pamela", last name unknown.  MASSETTI, as supervising nurse failed to ensure that inmates who were recently released from suicide watch, like POWERS, received adequate post release observation and monitoring and failed to ensure that actively suicidal inmates who were just released from suicide watch, would be assessed and treated with medication and psychiatric treatment.

127.     Defendants DOES 5, 6 and MASSETTI's conduct was so closely related to the deprivation of POWERS' right to be the moving force that caused the constitutional violation, injuries and death.

128.     As a direct and legal result of Defendants' acts, Plaintiff and Decedent have suffered damages, including, without limitation, past and future pain and suffering, and compensatory damages.  Such damages including attorneys' fees, costs of suit, and other pecuniary losses not yet ascertained.

Additionally, Defendants are liable to Plaintiff for compensatory and punitive damages under 42 U.S.C. § 1983.

## SIXTH CLAIM FOR RELIEF

**14th Amendment-*State Created Danger***

**(On behalf of the Estate of Scott Powers and Asserted Against RODRIGUEZ, FIELDING, RAMIREZ, NEWELL, WELLS, ALEXANDER, MASSETTI, and DOES 1-10)**

129.     Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 128 of this Complaint with the same force and effect as if fully set forth herein.

130.     Under the Fourteenth Amendment, POWERS had the constitutional right to be free from defendants' affirmative action of placing him in a position of actual, particularized danger. In this case, defendants knew of POWERS' medical distress, crisis and acute suicidality. Specifically, Defendants and each of them were aware of POWERS' phone call placed to the CSU mobile crisis mental health evaluators requesting to be voluntarily admitted on a suicide and 5150 hold at the local CSU facility.   Defendants were actively aware of the severity of POWERS' suicidality, in light of his past suicide watch history and expressed statement indicating his was determined to find any way possible to commit suicide while inside the jail-Such information was critical to defendants' assessment and decision to release POWERS into general population. With minimal supervision and without conducing proper suicide assessments. That unless, POWERS was actively medicated and under continuous observation, or sent out for higher level of care such as a psychiatric facility or even the crisis stabilization unit, he would be in grave danger if left unattended within the jail setting.

131.     While in-custody, POWERS was in the defendants' care and custody, and as such, Defendants had an affirmative duty not to expose POWERS to more danger than he would have been prior to their encounter.

132.     By blatantly denying POWERS help for his suicide crisis, and denying him admission to the CSU, when it is obvious he needed to be hospitalized or taken to the crisis stabilization unit, by concurrently denying opiate agonist medication while he was withdrawing from Fentanyl, by arbitrarily releasing him from suicide watch as rapidly as possible and by any coercive manner possible, by failing to conduct proper suicide assessments,  by leaving him in a general population cell unmonitored in  a 2nd tiered cell with easy "jumping" access,  all the while failing to monitor him, Defendants made an affirmative decisions which placed the POWERS is a position far worse than he was before being placed into the custody and care of the defendants.

133.     Defendants' affirmative acts created a foreseeable risk that POWERS would be in grave danger and/or go unconscious without the proper medical treatment and referral to a higher level of care.

134.     Accordingly, Defendants each are liable to Plaintiff S.V. for compensatory and punitive damages under 42 U.S.C. § 1983 and the 14th Amendment, as well as for wrongful death damages.

## SEVENTH CLAIM FOR RELIEF

### 14th AMENDMENT-INTERFERENCE WITH FAMILIAL RELATIONS
### (On behalf of Plaintiff and the  Estate of Scott Powers and Asserted RODRIGUEZ, FIELDING, RAMIREZ, NEWELL, WELLS, ALEXANDER, MASSETTI, and DOES 1-10)

135.     Decedent  Scott Powers had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state

interference in Plaintiff's familial relationship with his adult child, Whitney Feeney.

136.     Plaintiff Whitney Feeney had a cognizable interests under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff' familial relationship with her father mother, Scott Powers.

137.     The aforementioned actions of Defendants and DOES 1-10, along with other undiscovered conduct, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of Scott Powers and Plaintiff, and with purpose to harm unrelated to any legitimate law enforcement objective.

138.     As a direct and proximate result of these actions, Scott Powers experienced pain and suffering and eventually died. Defendants thus violated the substantive due process rights of Plaintiff to be free from unwarranted interference with their familial relationship with Scott Powers.

139.     As a direct and proximate cause of the acts of Defendants, Plaintiff suffered emotional distress, mental anguish, and pain. Plaintiff have also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Scott Powers, and will continue to be so deprived for the remainder of their natural lives.

140.     As a result of their misconduct, Defendants and DOES 1-10, are liable for Scott Powers injuries, either because they were integral participants in the failure to provide medical care, or because they failed to intervene to prevent these violations.

141.       Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Scott Powers and Plaintiff and

therefore warrants the imposition of exemplary and punitive damages as to the individual Defendants.

142.     Plaintiff bring this claim both individually and seek wrongful death damages under this claim. Plaintiff also seeks punitive damages and attorneys' fees under this claim.

## EIGHTH CLAIM FOR RELIEF
### NEGLIGENCE
**(On behalf of Plaintiff and Asserted against COUNTY, RODRIGUEZ, FIELDING, RAMIREZ, and DOES 1-10)**

143.     Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 142 of this Complaint with the same force and effect as if fully set forth herein.

144.      Defendants, and each of them, have a duty to operate and manage the Santa Barbara County Jail in a manner so as to prevent the acts and/or omissions alleged herein. Said defendants owed DECEDENT, as an inmate in defendants' custody, care and control, a duty of due care to protect his health and physical safety.

145.     Defendants RODRIGUEZ, FIELDING, RAMIREZ,  and DOES 1—10 were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as jail deputies and supervisors to DECEDENT. It was foreseeable that as a result of Defendants' acts and omissions, as described above, DECEDENT'S symptoms of suicidality and his co-morbid opiate withdrawal would worsen, resulting in his physical injury, suffering, and death. Defendants' breach proximately caused injuries and damages to DECEDENT as Plaintiff claim herein.

146.     As a direct and proximate result of the defendants' aforementioned conduct, the Plaintiff set forth that the defendants are liable to her for damages including but not limited to funeral and burial related expenses, and damages to

provide for the Plaintiff's deprivation and injury as a result of the loss of the decedent's support, comfort, counsel, familial relations, aid, association, care and services.

147.    Plaintiff also assert punitive damages against named COUNTY defendants for conduct that amounts to recklessness, maliciousness and oppressiveness.

## NINTH CLAIM FOR RELIEF

**BANE ACT C.C. 52.1 Et Seq. (State)**

**(On behalf of Plaintiff and Asserted against COUNTY, WELLPATH, RODRIGUEZ, FIELDING, RAMIREZ, NEWELL, WELLS, ALEXANDER, MASSETTI, and DOES 1—10)**

148.    Plaintiff hereby repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 147 of this Complaint with the same force and effect as if fully set forth herein.

149.    California Civil Code, Section 52.1 (*the Bane Act),* prohibits any person from using violent acts or threatening to commit violent acts in retaliation against another person for exercising that person's constitutional rights.

150.    Defendants RODRIGUEZ, FIELDING, RAMIREZ, NEWELL, WELLS, ALEXANDER, MASSETTI, and DOES 1—10 while working for COUNTY and WELLPATH and acting within the course and scope of their duties, denied DECEDENT necessary healthcare and custodial safety that to degree of reasonable certainty, would have prevented his death.

151.    When Defendants committed the above acts, they interfered with POWERS' civil rights to due process, to equal protection of the laws, to constitutionally adequate medical care, to be free from state actions that shock the conscience, and to life, liberty, and property.

152.    Defendants intentionally and spitefully committed the above acts to deny POWERS' the necessary healthcare that would have prevented his death.

153.     DECEDENT reasonably believed and understood that he was being denied the right to constitutionally adequate healthcare.

154.     Defendants successfully interfered with the above civil rights of DECEDENT and Plaintiff.

155.     The conduct of Defendants was a substantial factor in causing Plaintiff' harms, losses, injuries, and damages.

156.     Defendants COUNTY and WELLPATH are vicariously liable under California law and the doctrine of *respondeat superior* for all acts and omissions of their employees including acts and omission of named Defendants RODRIGUEZ, FIELDING, RAMIREZ, NEWELL, WELLS, ALEXANDER, MASSETTI, and DOES 1—10**.** The conduct of Defendants was malicious, wanton, oppressive, and accomplished with a conscious disregard for POWERS rights and Plaintiff' rights, justifying an award of exemplary and punitive damages as to the defendants.

157.     Plaintiff bring this claim as a successor-in-interest to the decedent, and seek survival damages under this claim. Plaintiff also seek punitive damages and attorneys' fees under this claim.

## TENTH CLAIM FOR RELIEF

**Failure to Summon Medical Care Per G.C. §845.6 AND §844.6**

**(Asserted against COUNTY, FIELDING, RAMIREZ, and DOES 1—6)**

158.     Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 157 of this Complaint with the same force and effect as if fully set forth herein.

159.     California Government Code § 845.6 creates an affirmative duty for jail staff "to furnish or obtain medical care for a prisoner in his custody." DECEDENT desperately required prompt medical attention from Defendants, Santa Barbara County Jail staff. Defendants had actual knowledge of DECEDENT'S need for immediate medical care and deliberately chose to not

furnish DECEDENT with medical care. Defendants failed to discharge the duty imposed upon them by California Government Code § 845.6. As a direct and proximate result of Defendants' acts and/or omissions, hereinabove described, DECEDENT suffered deteriorating mental health, cardiac arrest, and severe opiate withdrawal resulting in her untimely death.

160.    Additionally, Defendants failed to perform their mandatory duty under California Government Code § 845.6 to provide medical care to DECEDENT even though Defendants had actual knowledge that the DECEDENT was in need of urgent medical care for DECEDENT'S serious medical conditions comprising of her severe opiate withdrawal deteriorating mental and physical health and associated symptoms, and Plaintiff are authorized to maintain this cause of action.

161.     Defendants are liable for their employees' breach of their duty to summon required immediate medical care while acting in the course and scope of their employment under the doctrine of *respondeat superior*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment in their favor and against all Defendants, and DOES 1 through 10, inclusive, as follows:

1.    For compensatory damages according to proof, including wrongful death damages under state common law and under the 14th Amendment parental interference cause of action;

2.    For punitive damages against the individual defendants in an amount to be proven at trial;

3.    Por pre-death pain and suffering, loss of life and opportunity for life pursuant federal civil rights laws and case precedent

4.    For interest;

5.    For reasonable costs of this suit and attorneys' fees per 42 U.S.C. §1988; and per the Bane Act's attorney fees provision

6.    For such further other relief as the Court may deem just, proper, and appropriate.

### **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

Date: July 3, 2024              THE SEHAT LAW FIRM, PLC

                               By: */s/ Cameron Sehat*_____
                               Attorney for Plaintiff
                               Whitney Feeney